# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: March 2, 2026

```
*  *  *  *  *  *  *  *  *  *  *  *  *
BEATRICE CAIN,                       *
                                     *          No. 22-739V
                   Petitioner,       *
v.                                   *          Special Master Gowen
                                     *
SECRETARY OF HEALTH                  *
AND HUMAN SERVICES,                  *
                                     *
                   Respondent.       *
*  *  *  *  *  *  *  *  *  *  *  *  *
```

*Michael A. Baseluos,* Baseluos Law Firm, PLLC, San Antonio, TX, for petitioner.
*Mark. K. Hellie,* U.S. Depart. of Justice, Washington, D.C., for respondent.

## RULING ON DAMAGES[1]

On July 5, 2022, Beatrice Cain ("petitioner") filed her claim in the National Vaccine Injury Compensation Program.[2]  Petition (ECF No. 1).  Petitioner alleged that as a result of receiving an influenza ("flu") vaccine on September 1, 2021, she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA").  *Id.*  On November 14, 2023, a Ruling on Entitlement was entered, finding that petitioner has established she suffered a Table SIRVA. Ruling on Entitlement (ECF NO. 49).

A damages hearing was held on November 3-4, 2025, after the parties were unable to resolve damages informally.  After the hearing and a status conference held on November 10, 2025, I informed the parties of my intent to resolve all categories of damages in a written ruling that provides further explanation for my findings.

### I.  Procedural History

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

After the Ruling on Entitlement was issued by the Chief Special Master, the case moved to the damages phase.  After unsuccessful settlement negotiations in the Special Processing Unit ("SPU"), this case was transferred to my docket on March 5, 2024.  Order of Reassignment (ECF No. 63).

To support her damages claim, petitioner filed three expert reports from orthopedist, Dr. Glenn Whitted.  Petitioner's ("Pet'r") Exhibits ("Exs.") 59, 64, 72.  Petitioner also filed an expert report from neuroradiologist, Dr. Robert Turner.  Pet'r Ex. 71 (ECF No. 104).  Additionally, petitioner filed a life-care plan from Misty Coffman, RN, MSCC, and rebuttal reports to respondent's proposed life care plans.  *See* Pet'r Exs. 61, 65, & 83.  Petitioner filed a functional capacity report and video of petitioner, performed by Francis Pottenger, PT, DPT, NRCME.  Pet'r Exs. 78, 80.  During the damages hearing held on November 3-4, 2025, petitioner, Dr. Whitted, Nurse Coffman, and Physical Therapist Evaluator, Mr. Pottenger testified.

Respondent submitted expert reports from orthopedist Dr. Geoffrey Abrams.  Respondent ("Resp't") Exs. A, E.  Additionally, respondent submitted a life care plan from Laura Fox, MSN, BSN, RN.  Resp't Ex. C (ECF No. 90).  During the damages hearing, Dr. Abrams testified to support respondent's position on damages in this matter.

Petitioner also submitted a pre-hearing brief on damages in this matter, requesting $250,000.00 in past pain and suffering; $31,354.36 in out-of-pocket medical expenses, along with $655.52 in gas milage; $22,249.44 in home modifications; home cleaning services for life totaling $630,854.40; home health aide for life costing $138,679.20; $280,582.50 in platelet rich plasma ("PRP") injections for life; pre-PRP evaluations for life costing approximately $31,600.18; physical therapy evaluations and 4 sessions a year for life beginning at age 39 totaling $111,424.40; and durable medical goods totaling $14,265.45.

After the hearing on damages, I held a status conference when I explained my analysis and decisions relating to damages in this case and this ruling memorializes those decisions.  Further, these decisions are based on a review of the evidence, including the testimony of petitioner, petitioner's experts, and respondent's experts.  As some of the issues in the life care plan were not contested by respondent, the ruling on damages only resolves the items of damages that were not agreed upon by the parties.

## II.    Brief Factual History

### a.  Summary of Petitioner's Medical History Related to Her SIRVA

Prior to receiving the flu vaccine on September 1, 2021, petitioner enjoyed swimming for a Master's swim team, and had planned to compete in the Masters Swimming Nationals in November 2022.  Pet'r. Affidavit ("Aff.") at 7.  During the hearing, petitioner testified that she swam competitively in college and because of her dual citizenship in Hungary, had swum in the Olympic trials for Hungary.  Transcript ("Tr") at 315-376.

On September 1, 2021, petitioner received her flu vaccine at the CVS and her vaccine was administered by the pharmacist. Pet'r. Aff. at 1. Petitioner stated that the pain in her left arm was immediate and described it as "sharp" and "excruciating." *Id.*; Tr. 324. Petitioner explained that the shot was administered "so high up on my arm and so far back," and that she had never received a shot in that location before. Pet'r Aff. at 1. Consistent with her affidavit, petitioner testified that the pharmacist told her that the "plunger was stuck" in her left arm, which is why the actual shot administration took so long. Tr. 324-25.

Petitioner stated that the pain in her left arm and shoulder was felt immediate. Pet'r Aff. at 2. The following day she took Tylenol to relieve the pain, but that did nothing to relieve the pain. *Id.* The pain made it difficult for her to sleep, care for her children, and she could not swim. *Id.*

On September 21, 2021, petitioner had her first doctor's appointment with Dr. Alejandro Arizmendi. Pet'r Aff. at 2; *see also* Pet'r Ex. 6 at 4. Petitioner reported to Dr. Arizmendi that she had "left arm pain after receiving the flu vaccine at the CVS on 9/1/2021 and Tylenol does not help." Pet'r Ex. 6 at 4. Petitioner's lateral deltoid area was tender to palpation and petitioner's range of motion was noted as "limited due to pain (rotation/abduction)-rates 7/10." *Id.* at 5. Dr. Arizmendi diagnosed petitioner with "acute pain of left shoulder," gave petitioner a prescription for Ibuprofen 600 mg, and administered a Ketorolac Thromethamine injection to relieve petitioner's pain. *Id.* at 5.

Petitioner had an MRI of her left shoulder on September 27, 2021, which revealed fluid within the biceps tendon sheath compatible with biceps tendosynovitis, increased signal and thinning of the teres minor tendon, compatible with a partial tear with adjacent fluid and swelling, and mild subacromial/subdeltoid bursitis and glenohumeral joint effusion. Pet'r Ex. 9 at 1. The following day, petitioner had a follow-up appointment with Dr. Arizmendi, and reported that the NSAIDs provided no additional relief to her shoulder pain and her limited range of motion was interfering with her physical and daily life activities. Pet'r Ex. 6 at 1. Dr. Arizmendi gave petitioner a referral to an orthopedist and noted that petitioner continued to have acute left shoulder pain. *Id.* at 1.

On October 6, 2021, petitioner had an appointment with Jacob Ethridge, PA at Westover Hills Orthopaedics. Pet'r Ex. 4 at 31. The HPI provided that petitioner had left arm pain that ranged from 3 to 10 out of 10 on the pain scale, and it began after receiving the flu vaccine. *Id.* at 32. Petitioner reported that Ibuprofen was ineffective, and she was having difficulty lifting, carrying, pushing/pulling, changing her clothes, and lifting her child. *Id.* The physical examination was positive for tenderness of the "greater tuberosity and the bicipital groove," and "tenderness of the supraspinatus, glenohumeral joint region, the deltoid, and the lateral cuff insertion," of her left shoulder. *Id.* at 33. Petitioner's active range of motion was recorded as 135 degrees forward flexion, internal rotation was to L3, and abduction was 90 degrees. *Id.* She had positive Hawkins, Neer's and Speed's signs, along with a positive empty can sign, demonstrating left arm dysfunction. *Id.* Finally, her left abduction was noted as 4/5 and internal rotation was 4/5. *Id.* At this appointment, after the physical examination and taking her history, she received a steroid injection into the subacromial space. *Id.* at 33-34. Petitioner was

diagnosed with a partial thickness rotator cuff tear and tendinitis of long head of biceps brachii of [the] left shoulder. *Id.* at 34.

Petitioner began physical therapy on October 11, 2021. Pet'r Ex. 4 at 48. Petitioner stated that she went twice a week, even though the physical therapy, which included use of the TENS machine, massage, cupping, dry needling, ultrasound probing, and strength exercises did nothing to relieve her pain. Pet'r Aff. at 3. At her first physical therapy appointment, petitioner's goal was "to be able to use my arm again." Pet'r Ex. 3 at 54. Her current pain level was a five, despite having a steroid injection five days before. *Id.* Petitioner described her pain was "tender, shooting, sharp, [and] stabbing." *Id.* Her range of motion compared to her right arm was significantly reduced. For example, her passive flexion of her right arm was recorded at 180, but her left was 90 and her external rotation of her right arm was 90, but her left was only 30 (with discomfort). *Id.* at 55.

After approximately twelve physical therapy appointments, petitioner had a follow-up with PA Ethridge on November 17, 2021. Pet'r Ex. 4 at 26. Petitioner reported that the steroid injection gave her "significant relief," but the effectiveness was wearing off and she was experiencing pain with range of motion in physical therapy. *Id.; see also* Pet'r Aff. at 3 (stating that the steroid shot helped temporarily but was wearing off). Her physical examination from this appointment remained the same as her appointment from October 6, 2021. During this appointment it appears that there was a discussion of subacromial decompression surgery, but there it was noted that there was "reluctance to proceed." *Id.* at 28. Instead, the plan was for petitioner to continue physical therapy and if no improvement, to return for another steroid injection and schedule a plasma rich platelet injection. *Id.*

Petitioner sought a second opinion from another orthopedic surgeon to determine if there were other options to reduce her left shoulder pain. Pet'r Aff. at 3. On November 22, 2021, petitioner had an appointment with orthopedist, Dr. Matthew Murray. Pet'r Ex. 15 at 2. Petitioner reported that she had received a steroid injection that only provided marginal relief, but still had considerable pain with movements and sleeping. *Id.* The physical exam was positive for tenderness over the short-head biceps, and her strength was recorded as normal on forward flexion, shoulder abduction, and internal rotation. *Id.* Interestingly, her empty can test, Hawkin's impingement, and Neer's impingement tests were negative, only her O'Brien's test remained positive. *Id.* at 3. Dr. Murray discussed both operative and non-operative options with petitioner, and petitioner elected to move forward with another steroid injection. *Id.* at 3. Petitioner stated that after this steroid injection, her arm felt heavy for about a week, and the pain in her left shoulder decreased, but by December 20, 2021, her left shoulder pain returned. Pet'r Aff. at 4.

Between her orthopedic appointments, petitioner continued her physical therapy treatment. *See generally* Pet'r Ex. 3. On November 30, 2021, petitioner reported "mild pain" that was persistent in the anterior and posterior aspect of her shoulder. Pet'r Ex. 3 at 23. The physical therapist noted that petitioner had "good tolerance of rotation through [passive range of motion] although petitioner had pain in the posterior aspect of her shoulder with passive flexion." *Id.* At the January 11, 2022 physical therapy appointment, petitioner reported her pain was a 4 out 10 and she continued to have persistent mild pain in the anterior and posterior aspect

4

of her shoulder. *Id.* at 19. It was noted that petitioner had "muscle guarding" with passive external and internal rotation, and flexion and that she had mild restrictions with posterior glenohumeral joint glide. At the next appointment, on January 17, 2022, the "summary of findings" provided that petitioner's "largest functional deficits continue to be external rotation and flexion," and that she had no major restrictions of the glenohumeral joint, and had mild capsular mobility with noted posterior mobilization. *Id.* at 16. The physical therapist note stated, "[patient] tolerating therapy very well." *Id.*

In her affidavit, petitioner stated that she wanted to move forward with only one orthopedist, and opted to continue her shoulder care with Westover Hills Orthopaedics. She had a follow-up appointment with PA Ethridge on January 18, 2022 for her left shoulder pain and dysfunction. Pet'r Ex. 16 at 29. At this appointment, petitioner moved forward with using Platelet Rich Plasma ("PRP") injections as a way to mitigate her pain and improve shoulder function. Approximately one month later, on February 28, 2022, petitioner had a follow-up appointment with Physician Assistant Montalvo at Westover Hills Orthopedaedics. *Id.* at 22. Petitioner reported a "popping and weakness" in her shoulder and continued to use the TENs unit, but it provided no relief. *Id.* at 24. Her active forward flexion had improved to 160 degrees, but with pain, and her abduction improved to 90 degrees-but again with pain, although her passive range of motion in all directed was noted as normal. *Id.* at 24. PA Montalvo wrote that petitioner did have a more "noticeable" improvement post-PRP in her rotator cuff area, but not in her subdeltoid of the left shoulder and her pain with motion and strengthening was limited to the subdeltoid bursa. *Id.* at 25.

Between the first and second PRP injection, petitioner went back to physical therapy. Pet'r Ex. 37 at 40. At her appointment on February 15, 2022, petitioner reported her pain was a 1 out 10 and still had mild pain in the anterior and posterior aspect of her left shoulder. *Id.* It was noted that the largest deficits were in petitioner's external rotation and flexion, and that given how petitioner reported that her "pain has not subsided or changed much," she was willing to try "aggressive soft tissue approach." *Id.* at 40.

Petitioner received her second PRP injection to treat her subdeltoid bursitis on March 15, 2022. *See* Pet'r Ex. 4 at 6. She was directed to return in one month for a follow-up. *Id.* On April 11, 2022, petitioner had a follow-up appointment with PA Ethridge, and she reported "very minor short-term improvement" with symptoms with the PRP injections and that her tendinitis symptoms of the long head of biceps brachii of the left shoulder had returned. *Id.* at 15. An MRI and Arthrogram of petitioner's left shoulder were ordered. *Id.*

On May 4, 2022, petitioner had a second MRI of her left shoulder. Pet'r Ex. 37 at 36. A tear of the rotator interval capsule was identified, but the teres minor tear appeared to have resolved. Pet'r Ex. 4 at 4. On June 3, 2022, petitioner had an appointment with PA Ethridge to review her MRI. Pet'r Ex. 37 at 10. Petitioner still demonstrated tenderness of her subdeltoid bursa, deltoid, and lateral rotator cuff insertion. *Id.* Her forward flexion was still 160 degrees with pain and she could abduct her left shoulder to 90 degrees. *Id.* Petitioner demonstrated positive Hawkin's and Speed's tests, but her Neer's and O'Brien's tests were negative. *Id.* PA Ethridge noted that petitioner's teres minor tear appeared to have healed, but the latest MRI showed a "new rotator interval capsular tear." *Id.* at 10. PA Ethridge recommended that

petitioner continue her home exercise program to strength her rotator cuff and deltoid. *Id.* He also noted that petitioner had "partial improvement with PRP injections" into her subdeltoid and subacromial space.

On September 19, 2022, petitioner returned to Westover Orthopaedics and met with Dr. Jeffrey Dean. Pet'r Ex. 37 at 3-5. He discussed with her the partial thickness tear of her rotator cuff and how it had improved between her two MRIs, and that there was no surgical intervention necessary for the rotator interval capsule abnormality. *Id.* at 4. He also explained that petitioner's subdeltoid bursitis was greater than twelve months and that there are "not good surgical options." *Id.* at 5. Additionally, Dr. Dean wrote, "Discussed [petitioner] may attempt full activity despite pain and needs to stretch scar tissue and strengthen rotator cuff." *Id.* Petitioner reported "partial relief with PRP [injections]," and wanted to move forward with another injection. *Id.*

At her next appointment with Dr. Dean, on March 3, 22, 2023, petitioner demonstrated improved abduction with pain at 140 degrees, but decreased forward flexion to 155 degrees with pain. Pet'r Ex. 45 at 17. Petitioner's passive range of motion was limited and Dr. Dean recorded petitioner's passive forward flexion was 160 degrees and her abduction was 150 degrees. Petitioner had positive Hawkin's and empty can signs, but negative Neer's and O'Brien's signs. *Id.* Under "Assessment/Plans," Dr. Dean wrote:

> Subdeltoid Bursitis of Left Shoulder: Discussed arthroscopic subacromial decompression may provide relief but no guarantee. Discussed patient [has] plateaued with conservative care but could receive periodical improvement with repeat PRP injections. Discussed cost of PRP currently $600 per injection plus office visits 2-3 times per year for 3-4 years estimated. Discussed arthroscopic surgery could be $2000 surgeon cost and $5,000-$10,000 hospital fees if she goes that direction. Discussed continued future rehab could be $3,000-$4,000.

*Id.*

Petitioner returned to Dr. Dean on May 3, 2023, for a follow-up of her left shoulder condition. *Id.* at 12. Petitioner reported that she had been unable to do her home exercises, so her pain and shoulder dysfunction had gotten slightly worse. *Id.* Dr. Dean recommended adding turmeric or homeopathic treatment for her left shoulder while pregnant. *Id.* He also suggested hat petitioner consider PRP injections in the future for pain relief and "possible series of PRP for stacked relief." *Id.* Dr. Dean recommended petitioner continue with her home exercise program and again noted that arthroscopic decompression may provide some relief, but there was no guarantee. *Id.* Petitioner's diagnosis remained 1) partial thickness rotator cuff tear; and 2) subdeltoid bursitis of left shoulder. *Id.* Petitioner received a PRP injection on September 25, 2023. *Id.* at 7.

She returned to Westover Orthopaedics on December 27, 2023 for a follow-up for her left shoulder. Pet'r Ex. 52 at 2. Petitioner's pain was recorded at a 4 out of 10 and she reported that the PRP helped for about two and half months, but it returned, and she the pain was "constant" with certain movements. *Id.* Petitioner reported that she was doing home exercises and light

6

weights. *Id.* Petitioner requested to repeat PRP, which was done on January 2, 2024. *Id.* Petitioner had three more PRP injections to her left shoulder in 2024 and continued these injections into 2025. *See* Pet'r Ex. 66 at 7, 20; *see generally* Pet'r Ex. 85 & 91. At an appointment with Dr. Dean on May 28, 2025, petitioner reported that her pain was "constant and aggravated with movement," and that she prefers PRP injections over steroid injections due to concerns of frequent steroid use. Pet'r Ex. 91 at 9. Petitioner was open to holistic anti-inflammatory treatments, but turmeric did not provide any noticeable benefit. *Id.* Petitioner used a NSAID when her pain was becoming more severe, especially when carrying her toddler. *Id.*

At petitioner's most recent orthopedic consult on September 10, 2025, her left shoulder range of motion was recorded as: active abduction: 90; forward flexion: 90; external rotation: 30; and internal rotation: L5. Pet'r Ex. 91 at 18. Petitioner had a positive Hawkin's and Neer's impingement signs, but her drop arm test was negative. *Id.* Consistent with prior orthopedic evaluations earlier in 2025, Dr. Dean diagnosed petitioner with "chronic left shoulder pain due to rotator cuff pathology," and that petitioner found relief with PRP injections. *Id.* at 19. He also suggested an annual MRI is her symptoms changed. *Id.* Petitioner received a PRP injection on September 19, 2025, at which it was noted that her range of motion was "normal" but with pain and the PRP provides pain relief. *Id.* at 21.

During the hearing, petitioner testified that the PRP injections were the only thing that gave her significant pain relief. Tr. 349. Consistent with the medical records, she testified that the PRP provided relief for a few months, but then began to wear off. *Id.* She also explained how her left shoulder pain and dysfunction made it difficult for her to move around her house and care for her family in the manner in which she wanted. Tr. 350. She testified that her injury has prevented her from playing with her older son the way she wanted to. *Id.* Petitioner testified that as a result of her left shoulder injury, she has had to hire a cleaning service to clean the house every other week because cleaning with one arm makes the tasks time prohibitive and difficult. Tr. 361.

Additionally, her left shoulder injury was affecting the way she could care for herself, including making dressing and doing her hair difficult. Pet'r Aff. at 5-6; Tr. 328. But probably the most significant impact her SIRVA has had on her personal care is the fact that she cannot swim as she once had. Petitioner stated, "The fact that I may never be able to swim destroys me." Pet'r Aff. at 7. As "[a] backstroker…having good shoulders is essential for backstroke. I can't even streamline off the wall at this point, let alone pull through the water….The fact that I can't swim really hurts me." *Id.*; Tr. 333.

Further, petitioner testified that her sleep has been affected and that her pain is always in the background. Tr. 335. She indicated that her pain affecting her sleep, would make her somewhat irritable and then it would affect her relationship with her family members. *Id.* The PRP injections have improved her sleep, but she can only sleep on one side. Tr. 337. Ultimately, she testified that she had to adjust "every part of my life." Tr. 349. She testified that she can't swim, she cannot do yoga or Pilates, she can't swim with her middle child, and mentally and emotionally, it has taken a toll on her. Tr. 349.

**b.  Dr. Glenn E. Whitted, Orthopaedic Surgeon**

In support of her damages claim, Petitioner submitted two expert reports from Dr. Glenn Whitted and an independent medical examination of petitioner.  Pet'r Exs. 44, 64 & 59.  Dr. Whitted also testified during the damages hearing.

In his first report, Dr. Whitted opined that the MRI findings from May 4, 2022, which documented a "new rotator interval capsular tear," was a "progression of SIRVA," and not evidence of a new injury.  Pet'r Ex. 44 at 5.  He stated, "The current literature in support of the present understanding of SIRVA has established that SIRVA is a rotator cuff condition occurring as an injury consequent to an improperly administered vaccination."  Pet'r Ex. 44 at 5.  The three articles he references in his first report, Bancsi et al., Degreef, and Cook, all describe cases of post-vaccination shoulder injuries and the authors opine that the placement of the vaccination can cause the vaccine to be injected improperly into the shoulder structures, resulting in injury to the subacromial/subdeltoid bursa and lead to shoulder pain and dysfunction.  Pet'r Ex. 44, Tab 1; Pet'r Ex. 44, Tab 2; Pet'r Ex. 44, Tab 3; *see also* Resp't Ex. A, Tab 12.  The Degreef article describes three cases of frozen shoulder after vaccination, and the authors, agreeing with the Bodor article, stated that "[t]he subacromial bursa is prone to accidental infiltration in high deltoid intramuscular vaccination due to its anatomy.  Both an inflammatory process and an autoimmune pathway may be implicated in post-vaccination frozen shoulder, as vaccinations have been known to trigger autoimmune diseases."  Resp't. Ex. A, Tab 12 at 3.

On April 5, 2024, Dr. Whitted performed an independent medical examination of petitioner and he submitted a report from the evaluation.  Pet'r. Ex. 59.  Dr. Whitted observed that petitioner had mild periscapular atrophy, particularly in the supraspinatus fossa on the left.  *Id.* at 3.  Further, he wrote that petitioner had "very limited active and passive external rotation on the left," and that petitioner's "forward elevation is limited to about 140 degrees on the left."  *Id.*  He wrote, "Of note, with passive internal rotation on the left, there is palpable and audible popping on the left shoulder, indicative of rotator cuff weakness allowing translation of the humeral head."  *Id.*

In response to the undersigned's order from April 23, 2024, asking if the new finding on the May 2022 MRI was a result of an aggravation based on the non-use of the shoulder, Dr. Whitted wrote, "The thinning and undersurface tearing of the supraspinatus tendon did not appear on the initial MRI scan, because this is a progressive consequence of SIRVA injury, due to disuse of the shoulder based on inflammatory pain resulting from SIRVA."  Pet'r. Ex. 59 at 4.  Further, he stated, "Inflammatory pain at the shoulder resulting from SIRVA is anticipated to result in disuse of the shoulder, as seen in other unrelated shoulder conditions, such as adhesive capsulitis (frozen shoulder), where inflammatory shoulder pain results in decreased activity and motion of the rotator cuff.  *Id.*

Dr. Whitted also opined that petitioner would not benefit from a surgical intervention, such as arthroscopic treatment of the left shoulder because of the location of petitioner's pain.  Pet'r Ex. 59 at 7.  He stated that petitioner's orthopedic physician, Dr. Dean's assessment of whether surgery would be an effective treatment for was consistent with how he evaluates if surgical intervention is an option.  Dr. Whitted wrote that petitioner was making some mild

improvements, and therefore "did not support a strong consideration of surgery," as opposed to a patient that makes absolutely no improvement in physical therapy. *Id.* at 6. Dr. Whitted opined that petitioner's injury was likely permanent and that she could benefit from additional physical therapy sessions for five years, in conjunction with quarterly PRP injections for the remainder of her life. *Id.* at 7.

Finally, Dr. Whitted's responsive report to Dr. Abrams' report addressed several issues, including petitioner's range of motion findings in various medical records, the long-term use of PRP injections, and the length of time petitioner's pain has continued. Pet'r. Ex. 64. Dr. Whitted stated that Dr. Abrams' review of the records ignores the notations "with pain" when documenting petitioner's range of motion, and his suggestion that her range of motion was "normal," does not consider petitioner's expressed pain with these motions. *Id.* at 2-3. Dr. Whitted also contests that SIRVA is not a self-limiting condition as suggested by Dr. Abrams and that the case reports he refers to "do not comprise a general characterization of the condition of SIRVA," and they do not take into account the petitioner's actual and realized pain that has been ongoing for more than three years. *Id.* at 2. Dr. Whitted addresses the long-term use of PRP injections for shoulder dysfunction and pain, which Dr. Abrams suggested PRP is not a known treatment for shoulder disorders, stating that the articles Dr. Abrams cited do not "summarily discount the efficacy of PRP injections." *Id.* at 4. Referring to the Nejati et al. article Dr. Abrams cited, Dr. Whitted states that the article "admitted that PRP injections (and exercise therapy) significantly reduced pain and increased shoulder [range of motion] compared with baseline measurements." *Id.*; *see also* Resp't. Ex. A, Tab 15.[3] Dr. Whitted incorrectly stated that petitioner "has regularly attended supervised physical therapying the course of her treatment, but she continued to have pain despite her efforts in PT." *Id.* at 5. Petitioner did not have supervised physical therapy while receiving PRP injections and petitioner stopped supervised physical therapy in February 2022. Dr. Whitted concluded, similarly to his Independent Evaluation Report, that PRP injections for petitioner were "very important" in the consideration of petitioner's life care plan, and it has offered pain relief to petitioner's left shoulder symptoms. *Id.* at 5.

### c. Functional Capacity Evaluation---Mr. Francis Pottenger, PT, DPT, NRCME

Prior to the damages hearing, petitioner engaged Mr. Francis Pottenger, to perform a functional capacity evaluation. *See* Pet'r. Ex. 80. The evaluation of petitioner was comprehensive, considering her current employment and role in her family. *Id.* at 1.

Respondent had filed a motion to strike petitioner's FCE on March 7, 2025. Resp't. Mot. to Strike (ECF No. 118). Petitioner filed a response to respondent's motion the same day. Pet'r. Response to Resp't. Mot. to Strike. I held a status conference on May 12, 2025, addressing petitioner's FCE, including the video and written report. Scheduling Order (ECF No. 128). In that order, I explained that I would allow the written report to be admitted and give respondent an opportunity to review the video that accompanied the report. *Id.* I also indicated that petitioner's response to respondent's motion was to be struck.

---

[3] Nejati, P. et al., *Treatment of Subacromial Impingement Syndrome: Platelet-Rich Plasma or Exercise Therapy,* 5(5) Ortho. J. of Sports Medicine, https://doi.org/10.1177/2325967117702366 (2017). [Resp't. Ex. A, Tab 15].

I also reviewed the video from the FCE and allowed petitioner to designate segments of the evaluation that were related to petitioner's daily activities and petitioner would be allowed to show certain segments during the damages and Dr. Pottenger would be able to respond to such segments in oral testimony.

The FCE evaluation indicates that petitioner's role as "home/housekeeper" requires a "medium physical demand level," but she is only capable of assuming a position "in a sedentary physical demand level." Pet'r. Ex. 80 at 1. It should be noted that petitioner has full-time employment outside the home and the FCE appears to focus on her role as it pertains to her home life. *Id.* at 1 ("[Petitioner] works in a managerial/administrative position. However, for this FCE, her functional capabilities were compared to those of a housekeeper. The housekeeper position was selected as it reflects the physical requirements needed for [petitioner] to adequately run her household.").

As the FCE test was focused on her housekeeping role, both the video and report demonstrated that she has limited function of her left arm and shoulder, although she is right-hand dominant. For example, during the work simulation tasks, petitioner was able to sweep for 15 minutes "but had extremely limited use of her the left upper extremity." The video showed petitioner keeping her left arm close to her body keeping it in a "sling-like position." Pet'r. Ex. 80 at 23. The video and FCE also demonstrated that petitioner had limited ability to reach as far as possible from her body compared to her right upper extremity. Pet'r. Ex. 80 at 17. Further, Dr. Pottenger noted that petitioner also exhibited pain behaviors throughout the evaluation.

The FCE report and video, taken together, were useful in identifying specific areas of function that were most affected by petitioner's left shoulder SIRVA.

### d. Petitioner's Life Care Plan—Misty Coffman, RN, MSCC, CNLCP

Petitioner submitted three life care plans drafted by Misty Coffman, RN. *See* Pet'r. Exs. 61, 65, & 73. Additionally, Nurse Coffman testified at the damages hearing, explaining how she developed the life care plan.

The life care plan consists of three major categories: medical needs of petitioner; home services for petitioner; and durable medical goods and home modifications. Nurse Coffman, based her life care plans on a review of the medical records, meeting with petitioner, and a discussion with Dr. Glenn Whitted. Pet'r Ex. 61 at 5; *see also* Pet'r Ex. 73 at 9-10.

For future medical care, Nurse Coffman recommended that petitioner is provided orthopedic evaluations four times a year that coincide with PRP injections, also four times a year for life. Pet'r Ex. 61 at 16. Nurse Coffman explained that she called different orthopedic offices and found that the average cost of PRP injections was $1,072.50 in the Houston, TX area. *Id.* at 16. Nurse Coffman concurred with Dr. Whitted's opinion that the PRP injections "have significantly contributed to [petitioner's] functional improvement, enabling her to engage in a home exercise program crucial to her ongoing care," and stated that without the ongoing PRP treatments, petitioner "faces a cascading decline: loss of motion and strength, heightened pain,

and reduced function." Pet'r Ex. 65 at 4. She also recommended that petitioner participate in physical therapy, as recommended by Dr. Whitted, at 8 sessions four times a time a year for a total of 32 sessions. *Id.* at 17. Consistent with the physical therapy recommendation, petitioner would also need to have periodic re-evaluations. *Id.* at 16—17.

As for home services for petitioner, Nurse Coffman recommended petitioner have a non-certified home health aide for two hours a week for life. Pet'r Ex. 61 at 17. Nurse Coffman and petitioner testified that they were dependent on other family members for grocery shopping and putting grocery items away. *Id.* at 14. Nurse Coffman also recommended that petitioner have house cleaning services every 10 days for life. *Id.* Petitioner testified, along with video evidence, that she had limited range of motion to perform house cleaning tasks, like cleaning the bathtub, sweeping, or running a vacuum cleaner. Tr. 298; *see also* Pet'r Ex. 61 at 14.

Nurse Coffman recommended a TENS unit, TENS unit electrodes, ice packs, laundry cart with wheels, grab bars for the bathtub and shower area, a reacher, a hair dryer stand, grocery bag carrier and a special grocery shopping cart, a shower brush/sponge, and dual adjustable mattress and base. Pet'r Ex. 61 at 15. Explaining the reasoning for the adjustable mattress and base, Nurse Coffman explained that petitioner was having difficulty sleeping due to her ongoing shoulder pain. The life care plan recommended a replacement bed every 10 years, for a total of four. *Id.* at 19.

With respect to home modifications, Nurse Coffman explained that a one-time modification to petitioner's kitchen cabinets would be necessary due to her limited ability to reach high shelves and lift items above her shoulder. Pet'r. Ex. 61. The cabinets would be equipped with roll-out trays, appliance lifts, and pull-down shelves for easier access. *Id.* Further, Nurse Coffman recommended grab bars for petitioner to get in and out of the bath. Tr. 285.

### e. Dr. Robert Turner, Neuroradiologist

Petitioner submitted an expert report from Dr. Turner, a board-certified radiologist to provide his opinion regarding the images of petitioner's left shoulder. Pet'r. Ex. 71. Dr. Turner reviewed petitioner's MRI from September 27, 2021, x-rays from November 22, 2021, x-ray from February 28, 2022, an MRI from May 4, 2022, and an x-ray from January 2, 2024. *Id.* at 2-6. He stated that petitioner's images from September 27, 2021 through February 2022 do not demonstrate any calcific tendonitis. *Id.* at 8.

However, Dr. Turner did explain that petitioner's x-rays from January 2, 2024, do demonstrate "defined calcifications." Pet'r Ex. 71 at 7. Dr. Turner stated that the appearance of the calcific deposits on her left shoulder do not fit with the clinical course of the petitioner whose left shoulder began in 2021, not 2024. *Id.* Dr. Turner also opined that "such minimal deposits very rarely are symptomatic," and that typically calcific tendonitis is bilateral, but petitioner was not complaining of pain in her right shoulder. *Id.*

During the hearing, Dr. Turner testified that calcific tendinitis is a "self-limiting disease from the radiologist's point of view," and that it is "characterized by the deposition of calcium

pyrophosphate crystals in the rotator cuff, and overwhelmingly, the majority of those deposits are within the supraspinatus tendon." Tr. 14-15. Patients can go through extreme pain to no pain, and after a few years these calcifications can be resorbed by the body, which may be the most painful phase of calcific tendinitis. *Id.* at 15. Dr. Turner disagreed with Dr. Abrams' opinion that petitioner's left shoulder pain and dysfunction that appeared in 2024 into 2025 was related to calcific tendinitis. Tr. 16-20. He stated that petitioner's x-rays in 2024 which showed calcific deposits would "most likely be asymptomatic." Tr. 24.

### f.    Respondent's Expert-Dr. Geoffrey Abrams

Respondent submitted two reports from Dr. Geoffrey Abrams, an orthopedic surgeon. Resp. Exs. A & E. Dr. Abrams also testified at the damages hearing on November 4, 2025. Dr. Abrams accepts that petitioner suffered a SIRVA, but he asserted that she had almost fully recovered by 2024, based on the records he had reviewed. Tr. 401; Resp't. Ex. A at 9-10. During the hearing, he testified that he reviewed petitioner's updated records from 2025 and noted that petitioner had a "documented decrease in her motion beginning sometime in 2025 compared to the 2022 to 2024 time period." Tr. 403. Dr. Abrams stated, "It would be very difficult to attribute her decrease [in motion] to a SIRVA-related injury given that she had three years, from 2022 to 2024, of relatively stable motion after the vaccine in 2021. And then to have a sudden drop off in 2025, nearly four years after the [SIRVA] with a preceding three years of stability, it's pretty hard to accept that's related to the vaccine from four years prior." Tr. 404.

Dr. Abrams opined that petitioner's possible change in motion in her shoulder could have been related to a calcific tendinitis. Tr. 409. He testified that calcific tendinitis is typically an insidious event that is a non-traumatic event involving inflammation in the rotator cuff and subacromial area. *Id.* at 408. Treatment is conservative, with physical therapy and injections, but can include surgery, but "typically the pain and loss of range of motion that can occur with calcific tendinitis self-resolves in a variable amount of time." *Id.* at 408-09.

Dr. Abrams also testified regarding the use of PRP for orthopedic conditions. Tr. 415. He testified that he has referred patients for PRP treatments, but mostly those patients with knee arthritis. *Id.* at 415. He testified that PRP has been used for shoulder tendinopathy. *Id.* at 416; Resp't. Ex. E at 2. Dr. Abrams testified that use of PRP injections is not necessarily something recommended for life. Tr. 417; Resp't. Ex. E at 2. During the hearing, Dr. Abrams, opined that PRP treatments may be appropriate, but there is always an option to re-evaluate whether the treatment is appropriate for the condition. Tr. 421. Dr. Abrams testified that PRP injections does not come without unintended consequences and referring to petitioner's bruising of her arm due to the injections, shows how it can lead to complications. *Id.* at 423. He testified that making the decision to use PRP four to six times a year for life "is not a decision to be taken lightly." *Id.*

## III.    Legal Standard

The Vaccine Act provides that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury," a petitioner may recover "an award not to exceed $250,000." 42 U.S.C. § 300aa-15(a)(4). With regard to pain and suffering and all other

elements of damages, the petitioner bears the burden of proof and the medical records are the most reliable evidence of petitioner's condition. *See, e.g.*, *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 537-38 (2011).

Prior to my appointment as a special master, former Chief Special Master Golkiewicz and others developed an approach with the goal "to fairly treat all petitioners" by "creat[ing] a continuum of injury", in which the statutory cap was reserved for the most severe injuries and lower awards were made for less severe injuries. *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007). In *Graves,* Judge Merow granted review of a special master's pain and suffering award, holding that the "continuum" approach was not "rooted in the statute or precedent". *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013). Judge Merow set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the record evidence, without regard to the $250,000 cap. Only then as a second step, if the award would exceed $250,000, it must be reduced to that maximum. *See id.* at 589-90.

In the Vaccine Program's subsequent history, special masters have of course not been bound by *Graves*.[4] However, they have found it to be persuasive. *See, e.g., I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters have generally accepted the *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I agree with this prevailing approach. I assess the full value of the damages in a particular case before me, then apply the statutory cap if that becomes necessary.

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at *9 ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"). Factors

---

[4] Decisions of special masters and the U.S. Court of Federal Claims constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998). In contrast, the Federal Circuit's holdings on legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

A special master may also consider prior pain and suffering awards, especially for similar injuries, from both inside and outside of the Vaccine Program to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may also rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

## IV. Analysis and Conclusion

### 1. Pain and Suffering

Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury. *I.D.,* 2013 WL 2448125, at *9.

After an evaluation of petitioner's medical records, her testimony, and reports and testimony of the functional evaluation, I find that petitioner is entitled to $250,000.00 in past pain and suffering. There is no question that petitioner has been aware of her injury, as she demonstrated pain and limited range of motion since she received the flu vaccine on September 1, 2021. Additionally, petitioner began to struggle with activities of daily living, including difficulty dressing or caring for her children. Pet'r. Aff. at 7; Tr. 316, 349-50. Petitioner's should injury also affected her ability to go swimming, which has been extremely detrimental to her as she had been a former competitive swimmer. Tr. 316. Finally, since petitioner began to experience left shoulder pain in September 2021, her pain and impaired mobility has continued, with only PRP injections providing relief. Tr. 349; *see also* Pet'r. Ex. 80.

It is clear that petitioner's left shoulder injury from the vaccination she received on September 1, 2021, has affected her life negatively. She has documented pain and shoulder dysfunction since the vaccination, has undergone extensive treatment, and she has lost the ability to do things, such as swimming, she once enjoyed that were central to her life. While petitioner's injury was to her non-dominant arm, she lost significant function of her left arm to perform critical activities of daily living that were central to her life, such as being the primary manager of her family's household. Therefore, I find petitioner is entitled to $250,000.00 in past pain and suffering.

14

### 2.  Life Care Plan Elements

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursalable expenses incurred from the date of judgment awarding such expenses and reasonable projected unreimbursable expenses" that: (i) result from the vaccine-related injury for which petitioner seeks compensation; (ii) have been or will be incurred or on behalf of the person who suffered such injury; and (iii) (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or (II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, resident and custodial care and service expenses, special equipment, related travel expenses, and facilities determine to be reasonably necessary.  § 15(a)(1)(A).  "Reasonable projected unreimburseable expenses" must be shown to be "reasonably necessary."  §15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition" *Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs.*, No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); *see also I.D.*, 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person ... but short of that which may be required to optimize the injured person's quality of life" (quoting *Scheinfield v. Sec'y of Health & Human Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); *Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 2666285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); *Alonzo v. Sec'y of Health & Hum. Servs.*, No. 18-1157V, 2023 WL 5846682, at *11 (Fed. Cl. Spec. Mstr. Aug. 14, 2023).

### 1.  Plasma Rich Platelet Injections, Evaluations, and Physical Therapy

Petitioner is requesting that she be awarded six PRP injections annually for the remainder of her life.  Pet'r. Br. at 14.  In her affidavits and in her testimony, petitioner explained that the PRP injections are the only intervention that has been effectively treating the pain in her arm.  Tr. 342; Pet'r. Ex. 74 at 2-3.  However, their effectiveness appears to wear off after two months and appears to only be partially effective in providing pain relief.  *See* Pet'r. Br. at 13 ("Petitioner indicates that the pain relief from each PRP injection begins to wear off after about two months.").  Further, petitioner also indicated that she is seeking a new provider and the new provider will likely require additional evaluations.  I agree that petitioner should seek a new provider, given the difficulty she has had with her current provider relating to blood draws.  *Id.* As such, the undersigned awards petitioner PRP injections, in addition to re-evaluations six times a year for 10 years.  Further, petitioner's life care planner, Nurse Coffman provided an average cost of $1,072.50 for PRP injections.  However, it appeared that petitioner's real costs of PRP injections were between $500.00 and $541.22.  *See* Pet'r. Ex. 54; Pet'r. Ex. 90 at 2. As such, I am awarding petitioner $600.00 per injection for PRP, as costs are likely to increase, for a total of $36,000.00 for PRP injections.

Petitioner is also requesting funding for physical therapy evaluation and then four sessions per year.  Petitioner has not engaged with physical therapy since 2022, but indicates that

she does a home exercise program.  Further, it appears that petitioner's life care planner did not take into payment of physical therapy by health insurance.

### 2.  Home Health Aide/Homemaking Services

Petitioner will not be awarded any hours for a home aide.  As petitioner indicated, her husband and family members can fulfill these tasks, such as grocery shopping, putting away groceries, assisting with light cleaning, or organizing and decluttering.  *See* Pet'r. Ex. 90 at 6.  Further, while petitioner has demonstrated limitations to her functionality, the injury is to her non-dominant arm and thus, she has retained full function of her dominant arm.  This request is not "reasonably necessary" for petitioner and appears to be something that someone would ordinarily pay for from their income, regardless of a vaccine injury.  *See Petronelli v. Sec'y of Health & Hum. Servs.,* No. 12-285V, 2016 WL 1085455, at *3 (disallowing certain life care items because the items would ordinarily be purchased by a petitioner).

### 3.  Cleaning Services

Petitioner is requesting cleaning services every ten days for life.  Pet'r. Br. at 24.  I will award bi-weekly cleaning for petitioner for life.  In petitioner's functional capacity video, she demonstrated difficulty performing tasks, such as sweeping and vacuuming with her dominant arm.  Further, it was well explained how her shoulder injury has affected her ability to clean her house, including her bathtub.  *See* Tr. 250.  However, funding for deep cleaning services will not be awarded, as petitioner has not adequately demonstrated the need for a separate service to provide this cleaning or that it cannot be done by other family members.

### 4.  Home Modifications

Petitioner is requesting $22,249.44 for a one-time cost relating to home modifications in her kitchen and laundry room.  Petitioner's life care planner was able to sufficiently explain the modifications requested and petitioner was able to articulate how such modifications will assist her in her activities of daily living, including cooking, storing grocery and household items, and laundry.  I will award a one-time amount of $22,249.44 for such home modifications.

### 5.  Durable Medical Goods

Petitioner's life care plan includes a number of durable medical goods, including a new bed and mattress to improve her sleep and grab bars for her shower and bathtub.  Petitioner is awarded a new mattress that can be replaced one-time after 10 years and awarded funding for grab bars, but not for replacements 4-5 years as requested by petitioners.  Petitioner is also awarded a TENS unit and supplies with a replacement every 5 years for ten years.  Finally, petitioner is awarded a hair dryer stand for one time with no funding for a replacement.

### V.    Conclusion

Accordingly, I find petitioner is entitled to $250,000.00 in past pain and suffering, and the life care items discussed above, which are medically and reasonably necessary for petitioner.

The parties may fund the life care items as they see necessary to carry out the finding of this Ruling.  Thus, the following is hereby **ORDERED:**

1) **Within thirty (30) days, by Wednesday, April 1, 2026,** the parties are to file a joint status report providing (1) a complete and final life care plan which takes into consideration the items adjudicated herein, and (2) confirming that all items of damages have now been resolved and that no issues remain outstanding.

Thereafter, a damages decision will be issued.

**IT IS SO ORDERED.**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master